Filed 7/29/14  P. v. Segovia CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B246629 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA054573) |
| v. | |
| ISAI SEGOVIA et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Bernie C. LaForteza, Judge.  Affirmed.

Maxine Weksler, under appointment by the Court of Appeal, for Defendant and Appellant Isai Segovia.

Kelly C. Martin, under appointment by the Court of Appeal, for Defendant and Appellant Alejandro Topete.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Connie H. Kan , Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Isai Segovia and Alejandro Topete of first degree robbery in violation of Penal Code section 211[1] (count 1) and carjacking in violation of section 215, subdivision (a) (count 2). In both counts, and with respect to both defendants, the jury found that the crimes were committed for the benefit of, at the direction of, and in association with a criminal gang with the required specific intent. (§ 186.22, subd. (b)(1)(C).) In both counts, the jury found that Segovia had personally used a deadly and dangerous weapon in the commission of the offense. (§ 12022, subd. (b)(1).)

After denying defendants' motions for a new trial, the trial court sentenced Segovia to a total of 14 years in state prison for count 1, consisting of the midterm of three years, plus a 10-year term for the gang enhancement (§ 186.22, subd. (b)(1)(C)) and a one-year term for the deadly weapon use enhancement (§ 12022, subd. (b)(1)). The court stayed the sentence in count 1 under section 654. In count 2, the trial court imposed 15 years to life, plus an additional one-year term for the weapon use (§ 12022, subd. (b)(1)).

The trial court sentenced Topete to 15 years to life in count 2. In count 1, the trial court imposed the midterm of three years plus 10 years for the gang enhancement and stayed the sentence pursuant to section 654.

Segovia appeals on the grounds that: (1) his convictions for carjacking and robbery violate due process and must be reversed because there was insufficient evidence to corroborate Topete's self-serving statements incriminating him; (2) admission of testimony regarding the cell phone call to the victim purportedly from Segovia's mother was prejudicial error and a violation of due process; (3) the prosecutor committed prejudicial misconduct by his improper questioning of Segovia and the victim regarding the call from Segovia's mother's cell phone, which resulted in denying Segovia a fair trial; (4) the evidence was constitutionally insufficient to support the true finding on the gang enhancement, since it consisted primarily of the gang expert's opinion and was

---

[1] All further references to statutes are to the Penal Code unless stated otherwise.

2

based on speculation and hearsay; (5) the gang expert's hearsay-reliant opinion testimony should have been excluded as invading the jury's province, violating the confrontation clause, and as unduly prejudicial under Evidence Code section 352; (6) much of the gang expert's protracted opinion testimony, especially his opinion that the Palmas gang commits murders and owes allegiance to the Mexican Mafia, was of such little relevance and so extraordinarily prejudicial as to have rendered Segovia's trial fundamentally unfair, violating his right to due process, and his counsel was ineffective for failing to object on those grounds; (7) the trial court's denial of Segovia's new trial motion based on newly discovered *Brady*[2] evidence resulted in a miscarriage of justice, requiring reversal; and (8) Segovia was denied due process by the prosecution's suppression of material evidence, which would have cast doubt on the credibility of a key witness testifying against him.

Topete appeals on the grounds that:  (1) the admission of his statements to sheriff's deputies violated his Fifth and Fourteenth Amendment rights because the record does not show he received the required *Miranda* warnings,[3] and the questions regarding gang affiliation were not routine booking questions; (2) the questioning of Topete regarding prior arrests for DUI and robbery violated his federal constitutional rights to due process, a fair trial, and to present a defense; (3) the prosecutor committed prejudicial misconduct when he improperly questioned Topete about prior arrests; and (4) he was denied effective assistance of counsel because his attorney failed to request a limiting instruction on the prior arrest evidence.

---

[2]     *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

[3]     *Miranda v. Arizona* (1996) 384 U.S. 436 (*Miranda*).

Both defendants claim that the cumulative effect of the combined errors requires reversal, and each defendant joins in all issues raised by the other that may accrue to his benefit.[4]

## FACTS

**Prosecution Evidence**

On the evening of November 9, 2011, cab driver Nelson Rivera received a call from Topete, who needed a ride. Rivera knew Topete because Rivera had often given rides to Topete's mother and Topete. Topete asked Rivera to pick him up at a liquor store located at 15th Street East and Palmdale Boulevard in Palmdale.

When Rivera arrived, Topete was alone. Topete asked Rivera to drive him to East Avenue P-14. Rivera drove him there and parked on the dead-end street. Topete told Rivera that his mother would pay him in five or 10 minutes. She was at Vallarta market, which was about two miles away. The fare was approximately $7. Topete sat in the back of the cab, texting and speaking on his cell phone.

After approximately five minutes, Topete opened his door and held it open for another individual, later identified as Angel Aguilera.[5] Aguilera got into the back seat with a knife and asked Rivera for money. Rivera tried to "take off," but he felt a knife on his back after he had advanced only a short distance. Rivera never saw the knife. Another individual appeared next to the driver's door. Rivera never saw the third suspect's face, and he could not identify that individual.

---

[4] Segovia asserts that he joins in all issues raised by Topete that might accrue to Segovia's benefit. Topete asserts that Segovia's issue Nos. IV, V, VI, VII, and VIII were preserved for appeal by his trial counsel. Neither defendant makes any argument relating the other's issues to the particular factual circumstances of his own case. We therefore address the issues as argued by the individual defendants. (See *People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11 [reliance solely on codefendant's arguments and reasoning insufficient to satisfy burden on appeal].)

[5] Aguilera entered a guilty plea before trial.

4

Topete was "running everything." Topete told Aguilera, "Take his wallet. Take his keys." Topete started taking Rivera's "personal things" that were next to him, such as his phone earplugs.

The third person opened the driver's door, put a knife against Rivera, and threw him to the ground face first. This person went through Rivera's pockets and took his wallet, which contained about $30. Rivera remembered him as thin and taller than the other two.[6]

The men also stole money from Rivera's pants pocket. They took his GPS device from the dashboard and his cell phone. Rivera never heard Topete say anything to try to stop the robbery and carjacking. He did not hear Aguilera giving any orders to Topete. The third person got in the cab, and Aguilera drove it away toward Palmdale Boulevard. There were no other persons involved.

Rivera ran towards the train station. It took him about five minutes to arrive there, and he then borrowed a cell phone to call 911. Police arrived within three minutes.

Deputy Robert Hernandez and his partner, Deputy David Roach, heard the call that there had been a carjacking and the suspects were male Hispanics. They responded to an area around Avenue Q and Sixth or Fifth Street. Deputy Hernandez was aware that this area was a Palmas 13 gang area. En route, the deputies learned that another police unit had located the carjacked vehicle. The deputies then responded to Fifth Street East and Avenue Q, where they saw Rivera's taxicab. Because there were already enough deputies there, Deputies Hernandez and Roach decided to patrol the general area to try to find suspects.

The deputies drove one street west and drove southbound to the next cross street. They saw a black sedan, later identified as a Nissan Versa, cross in front of them. There were two Hispanic males inside, the driver and a passenger. Deputy Hernandez got behind the Nissan and, within a couple of seconds, a third person popped up from the rear

---

[6]    There was testimony that Segovia was taller than Topete and Aguilera.

seat. That person took a quick look at the deputies and disappeared out of sight. It appeared to the deputies that the third person was attempting to hide. The deputies initiated a traffic stop.

The Nissan pulled over and came to a complete stop. After the deputies parked behind the Nissan and started to get out of their car, the Nissan "thrust forward, like the vehicle was going to take off." It moved about 20 feet. Detective Hernandez used the air horn to signal the Nissan to stop, and the car stopped again. As the deputies approached the Nissan, Deputy Hernandez could see Aguilera lying down across the floorboards of the rear passenger seat.

Deputy Hernandez identified Segovia as the driver of the Nissan and Topete as the front seat passenger. He conducted a patdown search of Segovia but did not find any weapons on him. In Aguilera's pockets, Deputy Hernandez found a Garmin GPS unit and a set of keys. Segovia's demeanor was "very calm" and "just quiet." He did not seem surprised or confused about why he had been pulled over.

Deputy Jason Trevillyan arrived at the traffic stop. He assisted in the removal of the occupants and watched their hands. Topete was continually removing his hands from the dashboard, where he was told to keep them, and reaching downward. He was given "constant instruction to bring his hand back." Deputy Trevillyan searched the floorboard area and found a cell phone with an orange case. He was told it belonged to Rivera.

As part of the booking process, Deputy Roach asked Topete whether he was in a gang. Topete replied, "Yes," and said he was from Palmas 13. Topete told Deputy Roach that he was on his way to a gang meeting at "P Block," or Avenue P-14, before the carjacking occurred. Topete had $25.50 on his person at the time of booking. Deputy Hernandez asked Topete if he had a moniker, and Topete replied, "Bad Boy." He at no time stated he was no longer a member of Palmas.

Deputy Hernandez searched the carport area of Topete's apartment building, located on East Avenue Q-3. Between a vehicle covered with a tarp and the wall of the carport, the deputy found a steak knife and a black hat with the letter "P" on it. Another steak knife was found between the carport and a brick wall bordering the next property.

6

Based on his experience with the Palmas 13 gang, Deputy Hernandez testified that the letter "P" on the hat stood for the Palmas 13 gang. There was a backpack next to the knives and hat.

Detective Marc Phillips booked Segovia into custody. He gave his mother's name as Zoila Segovia[7] and said her telephone number was (661) 233-6860.

Rivera received a phone call from Topete's mother and, a few days before the preliminary hearing, from another woman as well. The call originated from phone number (661) 233-6860. The female caller did not say her name—only that she was the mother of one of the defendants. Rivera knew the voice of Topete's mother, and it was not she. The caller said "that he had done it and that he was sorry." She did not know why. She said that her son had a girlfriend who was pregnant. She offered to return the money stolen from Rivera and give him another phone.

Police returned to Rivera the GPS device, his keys, and his telephone. The day after the carjacking, Topete's mother called Rivera "to give [him] the wallet." There was no money in it. The money that had been in the taxi was not returned to him either.

Zoila testified that on November 9, 2011, she was living at Elizabeth Lake Road in Palmdale, and Segovia lived there as well. She was the registered owner of the black Nissan Versa that Segovia was driving when he was arrested. Her phone number is (661) 233-6860. She denied calling Rivera on November 27, 2011. She denied telling Rivera that Segovia had told her he felt "sorry" for robbing Rivera, and she also denied telling Rivera that the reason Segovia robbed and carjacked him was because Segovia's girlfriend was pregnant. She denied offering to pay Rivera the money that was stolen and offering to replace Rivera's cell phone if he dropped the charges against Segovia.

Deputy Steven Crosby testified regarding field information (FI) cards documenting contacts with Topete. Deputy Crosby filled out one card documenting an encounter on September 6, 2011, in which Topete said he was from the Palmas gang.

---

[7] We refer to Zoila Segovia by her first name to avoid confusion.

Deputy Crosby saw a "P" tattooed on Topete's neck. He also had a tattoo of four cards depicting kings, which would indicate 13 Kings. He was walking on a street frequented by Palmas gang members. Topete said his moniker was "Bad Boy."

Detective Anthony Delia, the investigating officer, testified as a gang expert. He stated that a Latino street gang that adds the number "13" to its name shows its allegiance to the Mexican Mafia. Individuals who are not members of the gang are not allowed to claim membership. All members of a gang are expected to "put[] in work" by doing some sort of illegal activity for the gang. The "primary activities" of the Palmas 13 gang are vandalism, robberies, shootings, murders, and narcotics sales. Detective Delia based this opinion on having investigated many Palmas gang members and their crimes. The same gang uses the names "Palmas," "13 Kings," and "CKF." Detective Delia's opinions were based on his training, experience, investigations, and conversations with other deputies, gang members, and victims.

Detective Delia noted Topete's tattoos. He testified that not all gang members have tattoos, and some are concerned with incurring gang allegations if they commit a crime. Detective Delia had encounters with Topete on July 6, 2011, and April 6, 2011. Both times, Topete indicated to him that he was a member of either 13 Kings or Crazy Kings Familia, and he appeared proud to be in a gang. Both contacts occurred at "hangouts" for Palmas and CKF.

Detective Delia had not spoken to Segovia before this incident. Segovia has the moniker "Listo." Detective Delia had spoken with one or more gang members regarding Segovia's membership and had heard he was a member of 13 Kings. An FI card from 2007 named Segovia as a suspected gang member. He was stopped in a car with three gang members.

Detective Delia was of the opinion that Topete was a Palmas 13 gang member because he admitted he was, he had gang tattoos, and Detective Delia's contacts with him always occurred when he was with other Palmas 13 gang members in Palmas 13 gang territory. He believed Segovia was a gang member because of the contact in 2007 and his presence in the car in the instant case, where he is accused of committing crimes with

8

13 Kings members. Detective Delia noted that Aguilera is also a Palmas 13 gang member with the moniker "Stocks" and a tattoo of the word "King" on the left side of his face.

Detective Delia testified regarding two felony crimes committed by 13 Kings gang members. In one case, a gang allegation was found to be true. Detective Delia believed that both defendants in those cases were Palmas 13 gang members.

Detective Delia expressed the opinion that defendants committed the carjacking and robbery for the benefit of the Palmas 13 gang. The crimes benefited the gang by giving them more standing in the community through creating fear. The items they took would be sold to purchase narcotics to sell or to purchase firearms to protect their gang and attack rival gangs. Detective Delia also believed the crimes were committed in association with the Palmas 13 gang because all three of the perpetrators worked together as one unit for their goal of robbing the victim and getting away. Even if the individual who pulled Rivera out of the car was not a gang member, he still committed a crime in association with a criminal street gang.

Crimes such as those committed in this case promote, further, and assist in criminal conduct by the gang because the older members hear about it, and the perpetrators might be rewarded with drugs or being brought into an activity the older members are doing. Such crimes make money for the gang, which helps the gang commit future crimes. The crimes also create more fear in the community and enhance the perpetrators' status in the gang.

**Defense Evidence**

Topete testified in his own behalf. He was 18 when arrested in the instant case. He was not currently a member of 13 Kings or Palmas. He was jumped into the 13 Kings gang on December 30, 2010, while he was drunk. He got out of the gang on September 20, 2011. "Bad Boy" was his nickname from the party crews he used to "throw." He testified that Segovia had never been in a gang.

On November 9, 2011, Topete left his apartment for the first time around 4:00 or 4:30 p.m. He went outside to take care of his brothers. Aguilera showed up in a white

9

Honda with a female passenger. Aguilera approached Topete and told him the shot caller named Sluge had sent him there to deliver a message. Topete had to get "rejumped" out of the gang. Sluge said to show up at "P Block" at a certain gang member's house. Topete did not recall the address. Aguilera told him, "We'll be outside." Topete told Aguilera he would get a ride from Rivera. Aguilera told him not to show up later than 8:00 p.m.

Topete returned to his apartment but came back down to the parking lot to check on his car, which had "some missing parts." He went back inside the apartment to get his backpack and tools. He wanted to get some car parts that were at his grandmother's house. He received a phone call from Segovia on his mother's boyfriend's cell phone, which Topete was using at the time. Topete told Segovia he needed a ride to his grandmother's house, and Segovia offered him a ride. Segovia arrived at Topete's residence at approximately 6:00 p.m. and drove him to his grandmother's house. Topete did not drive his own car because he had recently been in a car crash.

Topete and Segovia arrived at Topete's grandmother's house at approximately 7:00 p.m. Topete had his mother's cell phone with him, but only the texting function worked. After dropping off Topete, Segovia left because Topete said he did not need a ride back. Topete went into his grandmother's backyard "where [he] had [his] tools" and left 10 minutes later with the tools in his backpack. He had about a dollar and change at that time. He walked two blocks to a liquor store to use the pay phone to call Rivera.

Rivera arrived at the liquor store after approximately five minutes. Topete asked Rivera to take him to "P-14." They arrived at the house Topete planned on visiting, and Aguilera and others, including someone called "Ghost," were outside. Rivera parked across the street. Topete testified that Rivera told him it was going to be $5, and Topete told him he did not have anything on him. Rivera told him to call his mother. Using his mother's cell phone, he sent her a text to her boyfriend's phone. He knew she would have that phone with her. In the text message, he said he needed $5 to pay Rivera. He

10

did not get the chance to tell her where he was because "they came and rushed the van."**8** Topete next testified that his mother responded to him and said she was going to Vallarta, a market, to "cash it out." He said she texted again, but he did not get a chance to read the message because that is when "the guys came to the van and rushed."

Topete said the taxi was "rushed" by Aguilera and two other people from the right side. He then said two people came on one side and Aguilera on the other. The other two men were Ghost and Blackie. Ghost is a gang member. Topete did not know Blackie, who was a tall, skinny Mexican. Aguilera was the first to get in the car, on the passenger side. Topete did not open the door for him. Blackie went to the driver's side. Ghost entered the same passenger door as Aguilera had. When Topete tried to get out of the taxi, Aguilera pointed a knife at him. Topete then stated that Aguilera went to the driver's side and searched the car. Aguilera told Blackie to take Rivera's money and wallet. Topete saw Aguilera grab the GPS, the phone, and something square.

Blackie pulled Rivera onto the ground and searched him. Rivera ran away. Topete again tried to jump out of the taxi, but Ghost pushed him in. Blackie and Ghost got into the back passenger seat with Topete. Topete stated, "then the other member came in and jumped in the passenger side" in the front. It was "a guy named Listo." It was not Segovia, but rather a member of 13 Kings. Topete did not know his real name. Sluge was nearby in a white Honda parked on the sidewalk with a white girl in the driver's seat.

Aguilera started driving the taxi, and he and Ghost began arguing. Topete told them he wanted to get out of the taxi, and Aguilera parked on Fifth Street and East Avenue Q-4. Topete got out of the taxi and ran. Blackie, Aguilera, and Ghost jumped into the white Honda.

Topete ran towards his apartment and saw Segovia parked across the street. Topete asked him where he was going, and Segovia said he was on his way to the gas

---

**8** Topete first said that Aguilera and Ghost came over to the taxi right away. He then said it took them about three minutes.

11

station. Topete got in the car. At that point, Topete saw Aguilera running from the parking lot of Topete's apartment building by himself. Aguilera entered Segovia's car through the unlocked back door. Aguilera was sweating and had on black gloves. Segovia asked Aguilera what his problem was, and Topete told Segovia about what happened.

Aguilera said he wanted a ride to Lancaster. Topete told Segovia not to do it. Aguilera was lying down in the back seat. As they drove to the gas station, a white Honda was following them. It eventually left them, but not before Topete saw "the white girl and the other members" inside. At the gas station, they all got out and bought chips and drinks.

Segovia told Aguilera he was not going to Lancaster and was going to drop off Topete. When they neared Topete's apartment, they saw "all these patrol cars." Aguilera told Segovia to drive out of the area, but Topete told Segovia "not to do it." Topete said he did not have anything to hide and asked Segovia to drop him off in front of his apartment.

As he drove, Segovia reached into his glove compartment and pulled out $25. He told Topete, "This is for the laptop that you sold me." Topete had sold Segovia a laptop weeks before, and Segovia has already paid him $100. At that point they were crossing Larkin Street, and a patrol car came behind them and sounded their siren. Segovia tried to park the car on the sidewalk. He did not try to go forward or flee the scene.

Topete did not know there was a cell phone under his seat. He moved his hands to put drinks on the floor. He did not take Rivera's cell phone or earphones. Topete did not put the knives where they were found. Topete said Aguilera told him he had stashed everything in the parking lot but did not tell him where. Topete told Deputy Hernandez he would tell him everything Aguilera told him because Topete had nothing to do with it. After their arrest, while at the police station, Topete overheard Aguilera telling another inmate in his cell where he had stashed everything, including the wallet. Topete's mother told him Rivera was looking for it, and Topete told his mother what he had heard.

12

Topete testified that he was afraid of retaliation in jail. Aguilera saw him in the showers and told him not to be a rat, to "stop being a bitch," and to "go along with the flow." Aguilera punched him in the face approximately three times. Topete had received approximately six written threats from Aguilera. Topete took the threats seriously and was afraid. One of the notes stated, "You're a bitch-ass rat lame fool. No wonder the homies wanted to rejump your scary ass. I got 24 years. Still going to get out. Still active. Got you set up like a dumb motherfucker. Fuck you. You got it coming. And your mom's homie pointed me out. Right. Don't trip out."

Segovia also testified in his own behalf and stated he had never been in a gang. He had a wife and three-year-old son, but no girlfriend. His wife was not pregnant in November 2011.

On the day of the incident, he went to Topete's house because Topete had sold him a computer and the screen was broken. Topete had sold it to him for $100, but Segovia planned to sell it to someone else for $150 and give Topete $25. He went to Topete's house around 7:00 p.m. When he picked up Topete, Aguilera was with him and they both got into his car. He drove them both to Topete's grandmother's house to get parts for Topete's car. Segovia left Topete at his grandmother's. He was going to drop off Aguilera at Topete's home.

When Segovia was dropping off Aguilera, he saw his Aunt Rosemary and started talking to her. Segovia accompanied her to her apartment, and as he was getting back inside his car, he saw Topete running. Topete jumped into the car and told him that something had happened. Segovia turned off his car and asked him what happened. Aguilera then got into the backseat of Segovia's car.

Aguilera asked, "Where you guys going to go?" Segovia told him they were going to the store, and Aguilera said that he would go with them. They went to a gas station, bought drinks and candy, and started back to Topete's home. Aguilera told Segovia to drive him to Lancaster, but Segovia said he had to go home. Shortly thereafter, the police pulled them over.

Segovia denied involvement in the robbery and carjacking. He had never before heard the nickname "Listo."

Segovia had given Topete $25 on the way to Topete's grandmother's house, and Topete put the money in the glove compartment and left it there. Topete retrieved the $25 while they were on the way back to his apartment, before they were pulled over by police. Segovia denied ever having threatened Topete. He said he was not angry at Topete for telling Deputy Roach Segovia and Aguilera were the ones who committed the carjacking and robbery. Segovia denied having made any attempt to evade police.

Deputy Scott Sorrow spoke with Rivera after the carjacking. Rivera told him he saw two male Hispanics standing on the sidewalk in front of 409 East Avenue P-14 when he arrived in the taxi with Topete. He said those two male Hispanics were the ones involved in the case. Rivera did not say Topete gave orders to Aguilera to take Rivera's wallet and keys. Rivera said Aguilera and the other individual coming to the driver's side were the two who demanded money. He said Aguilera took his wallet, cash, and cell phone from his pocket, and his GPS device off the dashboard. Rivera did not say the third person went through his pockets. The only person who Rivera said had a knife was Aguilera. Rivera said the third person got into the driver's seat and drove off. He did not say Aguilera drove off. Rivera identified Aguilera and Topete, but not Segovia.

Maria Avila, Topete's mother, testified that Aguilera came to her house on November 9, 2011, between 4:00 and 5:00 p.m., but she refused to allow him to see Topete. Topete rarely went out prior to November 9, 2011. She received a text message from Topete that day, and she was going to go to an ATM at a store to withdraw money to take it to him.

After speaking with Topete after his arrest, Avila went to the carport area to look for Rivera's wallet. Topete said another person told him where it had been left. She returned the wallet to Rivera two days after her son's arrest.

**Rebuttal Evidence**

Deputy Roach testified that during the traffic stop, Topete began "spontaneously" speaking to him. Topete told him Aguilera and Segovia were present with him during the

14

carjacking and robbery. Topete said he was on his way to a gang meeting on Avenue P-14 and Sixth Street East. He identified Segovia and Aguilera as members of his gang. Topete said he just happened to be there during the carjack. He said Segovia had a knife. Segovia opened the taxi door, held the knife up to Rivera, and demanded money. Segovia pulled Rivera out of the car, threw him onto the ground, and began going through his pockets.

Topete said Aguilera went through the back passenger door and through the vehicle up to where the driver was sitting. He held a knife to the driver, yelled at him, and demanded money. Aguilera then drove the three of them away from the crime scene in Rivera's taxi. Topete never said there were more than three people involved. Topete said Segovia held the knife up to Topete and told him that "if he wasn't down, the gang will turn its back on him." Aguilera parked the taxi at the corner of Fifth Street East and Avenue Q, ran down Fifth Street East, and "stashed" the knives. They all got into an awaiting black Nissan and drove down the street where they picked up Aguilera.

Detective Delia testified that, to his knowledge, there was no one other than Segovia in Palmas 13 who had the name "Listo." On the day of the preliminary hearing, Topete told Detective Delia he wished to speak with him. Topete said he was scared because he had been receiving threats from Segovia and Aguilera, and he needed to be housed separately. Topete said Aguilera had the police report, which confirmed Topete had snitched on Segovia and Aguilera. Detective Delia later found a police report in Aguilera's cell. Topete said Segovia's nickname was "Listo," and Aguilera and Segovia were in the 13 Kings gang.

Detective Delia had known Blackie for several years. He was in the Palmas 13 gang also. His real name is Thomas James Reyes. Reyes was incarcerated at the time of the carjacking and was still incarcerated at the time of trial.

15

## DISCUSSION

## I. Sufficiency of Evidence in Support of Segovia's Convictions

### A. *Segovia's Arguments*

Segovia contends that, absent Topete's statements to the police incriminating him, there was insufficient corroborating evidence of Segovia's involvement in the carjacking and robbery of Rivera. No weapons or stolen items were found on Segovia's person or under his seat, his fingerprints were not found on the knives or in the taxi, and the victim was unable to identify him. Segovia and Topete testified to the same version of events, and Topete denied Segovia was involved. Segovia asserts his conviction violated due process, since it was based on insubstantial evidence.

### B. *Relevant Authority*

When determining whether the evidence was sufficient to sustain a conviction, "our role on appeal is a limited one." (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) The test of whether evidence is sufficient to support a conviction is "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.]" (*People v. Holt* (1997) 15 Cal.4th 619, 667.) "We draw all reasonable inferences in support of the judgment." (*People v. Wader* (1993) 5 Cal.4th 610, 640.) Reversal is not warranted unless it appears "'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Section 1111 provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." "Testimony," as used in section 1111, includes "'all out-of-court statements of accomplices . . . used as substantive evidence of guilt which are made under suspect circumstances.'" (*People v. Williams* (1997) 16 Cal.4th 153, 245; *People v. Brown* (2003) 31 Cal.4th 518, 555; *People v. Belton* (1979) 23 Cal.3d 516, 524-525.)

16

Evidence corroborating an accomplice's testimony "may be circumstantial or slight and entitled to little consideration when standing alone, and it must tend to implicate the defendant by relating to an act that is an element of the crime." (*People v. McDermott* (2002) 28 Cal.4th 946, 985-986.) The corroborating evidence may consist of a defendant's conduct or statements. (*People v. Douglas* (1990) 50 Cal.3d 468, 507.)

"The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime." (*People v. McDermott*, *supra*, 28 Cal.4th at p. 986; see also *People v. Abilez* (2007) 41 Cal.4th 472, 505; *People v. Narvaez* (2002) 104 Cal.App.4th 1295, 1303.)

### C. Evidence Sufficient

Topete was an accomplice as a matter of law, and the jury was so instructed. The jury was also instructed on the type of evidence needed to corroborate his statements. We disagree with Segovia and conclude there was sufficient independent evidence that tended to connect Segovia with the carjacking and robbery. (*People v. Douglas*, *supra*, 50 Cal.3d at p. 506.) Therefore, there was sufficient evidence of Segovia's participation in the crimes, and the jury verdicts must be upheld.

Rivera identified Aguilera and Topete as two of the three carjackers. Very shortly after the carjacking, Segovia was found driving approximately two blocks from the incident with Topete and a hidden Aguilera as his passengers. Segovia stopped the car initially but then made an aborted attempt to flee. When arrested, Segovia made no comments, asked no questions, and exhibited no surprise. There was also evidence that Segovia's mother telephoned Rivera a few days before the preliminary hearing. Segovia was arrested with two members of the same gang that he had been with when contacted by police approximately two years earlier, which corroborated Topete's statement that Segovia was a member of Palmas. Detective Delia testified as to the motivation of gang members to commit theft crimes.

The fact that Topete and Segovia had differing accounts of where they had gone and with whom preceding the carjacking also served as corroborating evidence. False

17

and contradictory statements of a defendant in relation to the charge are themselves material corroborative evidence. (*People v. Santo* (1954) 43 Cal.2d 319, 330; *People v. Taylor* (1924) 70 Cal.App. 239, 244.) We believe the record shows enough corroboration of Topete's early statements to provide sufficient evidence that Segovia was the third participant in the crimes. The corroborating evidence established, at a minimum, motive and opportunity, which have been found to be significant factors in sustaining convictions. (See, e.g. *People v. Szeto* (1981) 29 Cal.3d 20, 28-29; *People v. Vu* (2006) 143 Cal.App.4th 1009, 1022-1023, 1024.)

Finally, the jury was instructed regarding accomplice testimony with CALCRIM No. 334. In general, this instruction serves to caution the jury that the testimony of the accomplice witness is to be viewed with caution and that the defendant cannot be convicted on the basis of the accomplice's testimony unless it is corroborated by other evidence independent of the accomplice's statement or testimony. (See *People v. Zapien* (1993) 4 Cal.4th 929, 982.) We presume the jury followed the court's instructions. In this case, the jury nevertheless found sufficient evidence of Segovia's guilt beyond a reasonable doubt. We conclude the jury drew reasonable inferences from the evidence presented, and sufficient evidence supported the verdicts.

## II. Admission of Testimony of Telephone Call to Rivera

### A. *Segovia's Argument*

Segovia contends that admission of evidence that Rivera received a telephone call from a perpetrator's mother, who said her son was sorry for committing the crime and who offered to reimburse Rivera, was extremely prejudicial. The prejudice caused by this evidence was not cured by the court's limiting instruction. The erroneous admission of this evidence violated Segovia's federal constitutional rights to due process and a fair trial.

### B. *Proceedings Below*

The prosecutor's first witness was Zoila, Segovia's mother. She denied telephoning Rivera and saying she was the mother of one of the persons who "was accusing him." She denied saying her son felt sorry for robbing Rivera. She did not

18

offer to repay Rivera the money that was stolen and to replace his phone if he would drop charges against her son.

When Rivera testified, he said he received a call from Topete's mother, whose voice he recognized, and another woman. The other woman telephoned a few days before the preliminary hearing. The trial court sustained Segovia's hearsay objection when the prosecutor asked what the woman said.

At sidebar, Segovia's attorney pointed out that there were three perpetrators and argued that evidence of a phone call from "someone's mother" was overly prejudicial to his client when no connection to Segovia had been established. Although the call was linked to Zoila's phone, there was no evidence she had sole access to the phone.

The court excused the jurors and conducted an Evidence Code section 402 hearing on the issue. The prosecutor argued that the evidence was very relevant because Zoila indicated to Rivera "that her son had basically told her that he had committed a carjack and a robbery, and he was sorry for it." Therefore, Zoila's statements in the phone call were admissible to impeach her testimony and as party admissions by Segovia.

Segovia's counsel argued that Rivera did not recognize the voice of this caller, and it was not known who made the call. Moreover, the woman said her son had a pregnant girlfriend, and Segovia did not have a girlfriend. He was married with a three-year-old child, and his wife was not pregnant at the time of the crimes. Also, Zoila had at least three sons. Counsel argued there was not "enough foundational connection." Topete's counsel joined in the objections. She argued the call was complete hearsay and was not impeachment of Zoila because it was not known if she was the caller.

After further argument, the trial court found that the statement of the woman who said her son said, "'sorry for the robbery'" was an admission and an exception to the hearsay rule. The other portions of the statements were admissible for impeachment. The court stated that the fact the person was unknown, although the call came from Zoila's phone, went to the weight of the evidence rather than its admissibility. The court would give a limiting instruction. The court stated it had weighed the evidence within the

meaning of Evidence Code section 352 and found that the probative value, which was linking Segovia to the case, was not substantially outweighed by the danger of prejudice.

When Rivera resumed the witness stand, the prosecutor produced a photograph the prosecutor had taken of Rivera's phone, which showed the date, time and phone number of the caller. Rivera testified that the caller said "that her son had done that and that she was very sorry," referring to the robbery or carjack. She said she did not know why he did it but that he had a girlfriend who was pregnant. She offered to give him back the money and another phone. The prosecutor asked, "Now when she said that he did it, did she say, 'He told me he did it,' or did she just say 'he did it?'" Rivera replied, "No. She just said that he had done it and that she was sorry." Rivera later clarified that she said "he was sorry." The prosecutor asked, "So she said he did it, and he's sorry?" Rivera said, "Yes."

The trial court called a sidebar and told the prosecutor that the testimony had not panned out to be what the prosecutor had predicted. The prosecutor argued that it was not much different. Defense counsel disagreed and said it was not the understanding the parties had. The court stated it did not sound like an admission. The prosecutor, at the court's suggestion, asked Rivera some follow-up questions. Rivera repeated that "she said that he had done it and that he was sorry." When the prosecutor asked, "Do you know that she got that information from him or from somebody else?" Rivera replied that he did not know. At sidebar again, the prosecutor argued, "I think it goes to the—the weight, not the admissibility," but he believed he would have to recall Zoila to ask her if she received any information from anyone but her son about the case.

After hearing argument from both defense counsel and the prosecutor, the court ruled that, in light of that day's testimony, it did not believe there was sufficient foundation to support the admission exception to the hearsay rule based on Rivera's testimony. The court intended to strike the testimony. The court stated it would not strike anything about the "phone or the number." After further discussion, the court told the jury that the following testimony was stricken: "'Question: And what did she say?

20

Answer: That her son had done that and that she was very sorry.'" The court added that the jury must disregard the testimony and not consider it for any purpose.

### C. Relevant Authority

Only relevant evidence is admissible. (Evid. Code, § 350.) The test of relevance is whether the evidence tends ""'logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.]" (*People v. Scheid* (1997) 16 Cal.4th 1, 13-14.) The trial court's rulings on the admission of evidence constitute an abuse of discretion only if the ""'court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.""' (*People v. Ochoa* (2001) 26 Cal.4th 398, 437-438.)

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) The trial court's exercise of discretion "will not be disturbed on appeal absent a clear abuse; i.e., unless the prejudicial effect of the evidence clearly outweighs its probative value." (*People v. Karis* (1988) 46 Cal.3d 612, 637.)

### D. Analysis

Segovia contends that the tendency of the evidence of the telephone call to prove Segovia's guilt was undeniable, and the trial court's error in admitting the testimony of Zoila and Rivera on the subject of the phone call was irremediable. Segovia asserts his case was a close one on the issues of both his guilt and his gang affiliation. According to Segovia, the court's ruling that Zoila's statement constituted an admission without first hearing the testimony, and in light of Zoila's denials, was arbitrary and fundamentally unfair. There was no identification of the caller's voice, or any evidence Segovia had instigated the call or told his mother anything about the charged crimes. Thus, the evidence was extremely and uniquely inflammatory.

We disagree. We believe the trial court properly relied on the prosecutor's representations as to Rivera's testimony regarding the telephone call. The testimony

21

actually given by Rivera was not far off the mark, and given the effects of having the questions and answers interpreted by a Spanish language court interpreter, it may be that the prosecutor's expectations were well-founded. Rivera seemed to founder on the successive questions about what the mother's exact words had been, which became confusing—perhaps more so in translation. Rivera may well have believed he was repeating what he had previously told the prosecutor privately, as witnessed by Detective Delia, i.e., that the caller said, "My son told me he did it."

In any event, the record could not be clearer that the trial court's admission of the evidence was far from arbitrary or capricious, and any error in admitting the evidence of the phone call was harmless under any standard. The court allowed extensive argument and carefully weighed the issue. As to the court's curative efforts, it is generally presumed that striking evidence and admonishing the jury cures evidentiary error. (*People v. Osband* (1996) 13 Cal.4th 622, 676; see also *People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, 648 ["we presume jurors can 'unring the bell' and follow admonishments and instructions designed to cure a trial court error"].) There is no indication in the record that the admonition was insufficient. There is no authority for discounting as a matter of course the trial court's striking of testimony and instructing the jury to disregard it.

Thus, we conclude that the trial court did not abuse its discretion in fashioning its cure for the testimony given by Rivera regarding a defendant's mother's telephone call. Even if Rivera's testimony about the statement was of constitutional significance, the admission of the testimony was harmless beyond a reasonable doubt in light of the evidence of Segovia's guilt, discussed ante.

## III. Alleged Prosecutorial Misconduct in Questioning Regarding Call

### A. *Segovia's Argument*

Segovia asserts that the prosecutor's questions to Zoila and Rivera regarding the phone call implied the existence of facts that he made no effort to prove and had no reason to believe could be proved. This constituted misconduct and requires a reversal of the judgment. He argues that, had the jurors not believed Zoila made the phone call

and/or that Segovia was involved in her making the call, they would have had no reason for returning a guilty verdict as to him.

### B.  Relevant Authority

"The applicable federal and state standards regarding prosecutorial misconduct are well established.  '"A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"'  [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"'  [Citation.] As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]"  (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

"'It is, of course, misconduct for a prosecutor to "intentionally elicit inadmissible testimony."  [Citations.]'  [Citations.]"  (*People v. Smithey* (1999) 20 Cal.4th 936, 960-961; *People v. Bell* (1989) 49 Cal.3d 502, 532.)  It is also improper for a prosecutor to ask questions that suggest the existence of facts harmful to a defendant unless the prosecutor has a good faith belief that the questions will be answered in the affirmative, or that the facts can be proved and the prosecutor intends to prove them.  (*People v. Mooc* (2001) 26 Cal.4th 1216, 1233.)

### C.  Analysis

The record shows that defense counsel did not object to the prosecutor's questions to Zoila on the grounds of prosecutorial misconduct, nor did counsel request the jury be admonished regarding these questions, which would have cured any harm.  Therefore, Segovia forfeited any issue with respect to prosecutorial misconduct.  The same is true for the questions posed to Rivera on this subject.  "'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the

jury be admonished to disregard the impropriety.'" (*People v. Valencia* (2008) 43 Cal.4th 268, 281.)

Additionally, the record shows there was evidence that the phone call took place. Rivera testified about receiving the call, although he was not precise about the exact words spoken. The telephone number of the caller matched Zoila's telephone number. Thus, it cannot be said that the prosecutor lacked a good faith belief that the fact of the call could be proved. The testimony of one witness, if believed by the trier of fact, is sufficient to prove any fact. (Evid. Code, § 411; *People v. Vega* (1995) 33 Cal.App.4th 706, 711.)

Moreover, the record shows that the trial court allowed the evidence of the telephone call as impeachment of Zoila and agreed with the prosecutor's projected tactics. Therefore, the prosecutor's questioning did not constitute the use of deceptive or reprehensible methods to persuade the jury. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1238.) Also, the fact that Zoila denied being the caller, and that there was only circumstantial evidence that she was the caller, went to the weight of the evidence rather than to its admissibility.

Finally, if there was any prosecutorial misconduct in posing the questions to Zoila and Rivera, it was harmless under any standard. Here, the trial court struck Rivera's testimony about what the woman was ultimately purported to have said about doing the crime and being sorry. The court told the jury not to consider that evidence for any purpose. The trial court instructed the jury with CALCRIM No. 222, which cautioned the jury that "[n]othing that the attorneys say is evidence" and "[t]heir questions are not evidence." The instruction told the jurors not to assume "something is true just because one of the attorneys asked a question that suggested it was true." The jury was again told that if the court ordered testimony stricken from the record, the jury "must disregard it and must not consider that testimony for any purpose." Segovia's claim of prejudicial misconduct is without merit.

**IV. Sufficiency of the Evidence in Support of Gang Allegation**

   *A.  Segovia's Argument*

   Segovia contends that, in order to prove the gang enhancement, the prosecutor presented only police officers' opinions based on subjective criteria, outdated information from police-generated gang databases, and hearsay.  This evidence was unreliable and insufficient to support the true findings on the gang allegations against him.

   *B.  Relevant Authority*

   We review issues concerning the admissibility of opinion testimony for an abuse of discretion.  (*People v. Lindberg* (2008) 45 Cal.4th 1, 45; *People v. Prince* (2007) 40 Cal.4th 1179, 1222.)

   The elements of a section 186.22 gang enhancement may be proved by a combination of documentary evidence, percipient witness testimony, and expert opinion testimony.  (*People v. Gardeley* (1996) 14 Cal.4th 605, 626 (*Gardeley*).)  We review a section 186.22 gang enhancement finding for substantial evidence.  (*People v. Williams* (2009) 170 Cal.App.4th 587, 624.)  Substantial evidence is that which is reasonable, credible and of solid value.  (*People v. Cuevas* (1995) 12 Cal.4th 252, 260.)

   *C.  Analysis*

   We disagree with Segovia's claim.  Generally speaking, where a gang enhancement is alleged, expert testimony concerning the culture, habits, and psychology of gangs—including the motivation for an individual member's actions—is permissible, and a jury may rely on such testimony to render a finding on the allegation.  (*People v. Ward* (2005) 36 Cal.4th 186, 210; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1047-1048; *Gardeley*, *supra*, 14 Cal.4th at p. 617; *People v. Ferraez* (2003) 112 Cal.App.4th 925, 930-931.)  Detective Delia's testimony provided substantial evidence that Segovia's crimes were committed, at a minimum, in association with a criminal street gang with the required specific intent to assist that gang.  From his testimony, the jury could reasonably infer that Segovia, along with his coperpetrators, committed the robbery and carjacking in order to commit crimes for the gang and to enhance respect for himself and for the gang.

Detective Delia's opinions were clearly founded upon the solid ground of his experience. At the time of trial, he was a gang investigator with Safe Streets Bureau, the gang investigative unit in the Los Angeles County Sheriff's Department. He had been a deputy sheriff for almost 14 years. He received training in the academy, had worked in the jail, and had dealt with and interviewed hundreds of gang members about their culture, structure, and criminal activity. He also trained in the gang investigator school and attended a gang and subcultures class, various seminars and briefings, and other training sessions. He worked patrol for four or five years and arrested hundreds of gang members for gang-related crimes. Prior to becoming an investigator, he was assigned to the gang enforcement team in which his primary function was to contact gang members and arrest them when they violated the law. He had testified in court as a gang expert multiple times. It was part of his job to get to know gang members and their families.

One of Detective Delia's "target gangs" was Palmas 13, and he had spoken with Palmas 13 gang members hundreds of times. He had been an investigating officer on Palmas 13 cases approximately 30 to 40 times.

Detective Delia identified Aguilera and Topete as gang members. Although Detective Delia had not spoken with Segovia before the instant crimes, he had reviewed an FI card from October 2007 where a deputy had written that he believed Segovia to be a member of a gang. Segovia was stopped with three other gang members, one of whom was his brother, Noe. Noe is a documented Palmas gang member. In 2012, in the instant case, Segovia was in a car with 13 Kings gang members accused of committing crimes with them. The existence of a four-year or five-year gap between contacts with police was not inconsistent with maintaining his membership in a gang. Detective Delia believed Segovia was a gang member.

Moreover, Topete told Deputy Roach that Segovia was involved in the carjacking and robbery. Topete said that Segovia held a knife to him and said that if "he wasn't down" the gang would turn its back on him. Later, Topete said he was being threatened in jail by Segovia and Aguilera. At that point, Topete said that Segovia was a member of 13 Kings and his moniker was Listo.

26

In sum, considering the expert testimony in conjunction with the remaining evidence, the jurors reasonably could have concluded that Segovia committed the crimes in association with a criminal street gang. (§ 186.22, subd. (b)(1).) Furthermore, subdivision (b) of section 186.22 does not require a showing of current, active gang membership. (*In re Ramon T.* (1997) 57 Cal.App.4th 201, 206-207.) The purpose of the statute is to punish those who associate themselves with any gang with the intent to assist in any criminal activity by that gang's members. Proof that a defendant committed a crime in association with a gang member is sufficient to establish that the gang enhancement applies, without regard to a specific gang loyalty. (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.) It was clear Segovia knew that Topete and Aguilera were gang members. Topete had numerous tattoos, and was apparently Segovia's best friend. Segovia's own brother was a documented Palmas 13 gang member. Segovia was in the heart of Palmas territory with two Palmas gang members and engaged in one of the gang's primary activities. It was for the jury to assess the weight of the detective's testimony in the first instance, and if we believe that any rational juror could have been convinced by it, "we cannot deem it insufficient. [Citation.]" (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1384.)

We observe that Segovia fully cross-examined Detective Delia. In addition, CALCRIM No. 332 told the jury that it was not required to accept the expert's opinion as true or correct, and the opinion's meaning and importance were for the jury to decide. The jury was to decide whether the information on which the expert relied was true and accurate. Viewed in the light most favorable to the prosecution, there was credible and solid evidence supporting the reasonable inference that Segovia committed the instant offenses in association with, or for the benefit of, or at the direction of the Palmas gang, and that he intended to further the gang's criminal conduct by so doing.

Finally, Segovia's general complaints in conformity with several articles he cites, which question the reliability of gang expert testimony and police record-keeping on gangs in general, are not a basis for reversing the gang allegations in this case. His arguments regarding the nature of Detective Delia's expert testimony are without merit,

and we conclude there was no violation of his rights to due process, trial by jury, and a fair trial.

**V. Nature of Gang Expert's Hearsay Testimony as Invasion of Jury's Province, Confrontation Clause Violation, and Unduly Prejudicial**

### A. *Segovia's Argument*

Segovia contends the trial court erred in admitting Detective Delia's testimony on the ultimate issues contained in the gang allegation because it invaded the jury's province and was without evidentiary support. The error was not harmless because the evidence was weak, and the error was not cured by the jury instructions.

Segovia also contends that, because the detective's opinion was hearsay-reliant and was offered for its truth, the opinion testimony violated the confrontation clause. In addition, he argues that the hearsay-based testimony should have been excluded under Evidence Code section 352. If any of these claims was forfeited, Segovia maintains that his counsel was ineffective for failing to object.

#### 1. Alleged Usurping of Jury's Function

An expert may testify with respect to any subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact. (Evid. Code, § 801, subd. (a).) The culture and habits of criminal street gangs fall into this category. (*Gardeley*, *supra*, 14 Cal.4th at p. 617.) A gang expert properly may express an opinion that a crime is gang related. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 944-946; *People v. Ferraez*, *supra*, 112 Cal.App.4th at p. 930.) An expert's testimony is not objectionable merely because it embraces the ultimate issues to be decided by the trier of fact. (Evid. Code, § 805; *People v. Prince*, *supra*, 40 Cal.4th at p. 1227; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77 [opinion testimony often goes to the ultimate issue in the case]; *People v. Valdez* (1997) 58 Cal.App.4th 494, 507.)

Detective Delia's testimony did not express an opinion that Segovia was guilty of the crimes, nor was it tantamount to the expression of such an opinion. (See, e.g., *People v. Brown* (1981) 116 Cal.App.3d 820, 828-829.) Indeed, his "testimony was quite typical of the kind of expert testimony regarding gang culture and psychology that a court has

discretion to admit." (*People v. Gonzalez, supra*, 38 Cal.4th at p. 945.) Detective Delia did not testify that Segovia possessed a specific intent, even when he answered a hypothetical question based on the facts of this case. The detective gave his opinion only as to whether such crimes would benefit the gang and whether they were gang-related crimes at all. The answer reflected his experience as an expert with respect to the gang activity in the area in question. He therefore did not invade the province of the jury. As we have discussed, this opinion was not without evidentiary support, as Segovia alleges.

Detective Delia's testimony was unlike the testimony disapproved of in *People v. Killebrew* (2002) 103 Cal.App.4th 644, in which the expert made a pronouncement that when one gang member in a car has a gun, every other gang member in the car knows of the gun and will constructively possess the gun. The latter testimony reached beyond the facts of that particular case and also resolved the issue of constructive possession for the jury. On the other hand, Detective Delia's testimony was based partly on a legitimate hypothetical grounded in the evidence and did not constitute a finding of an ultimate fact. It was clear that Detective Delia was expressing his opinion, and the jury was instructed that it was not bound by the expert's opinion and could disregard any opinion it found unreasonable. (CALCRIM No. 332.) Segovia's argument has no merit.

2. Alleged Confrontation Clause Violation

Segovia contends that the admission of Detective Delia's testimony, in which he relied on the out-of-court statements of unidentified gang members to support his belief that Segovia was a gang member, violated his Sixth Amendment right to confront and cross-examine his accusers under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). He argues that *People v. Thomas* (2005) 130 Cal.App.4th 1202 (*Thomas*) and other appellate opinions reaffirming *Thomas* should be re-evaluated. *Thomas* held, inter alia, that "the materials on which the expert bases his or her opinion are not elicited for the truth of their contents." (*Id*. at p. 1210.)

Segovia's failure to object to the detective's testimony on the grounds it violated the confrontation clause forfeited that challenge on appeal. (*People v. Redd* (2010) 48

Cal.4th 691, 730.) Even assuming Segovia preserved the issue for appeal, it is without merit.

The confrontation clause has traditionally barred "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Crawford*, *supra*, 541 U.S. at pp. 53-54.) "Under *Crawford*, the crucial determination about whether the admission of an out-of-court statement violates the confrontation clause is whether the out-of-court statement is testimonial or nontestimonial." (*People v. Geier* (2007) 41 Cal.4th 555, 597.)

*Crawford* did not specify what constitutes a testimonial statement for purposes of the confrontation clause. (*Crawford*, *supra*, 541 U.S. at pp. 51-52.) The characterization of statements as testimonial or nontestimonial had eluded precise definition in cases following *Crawford*. In *Williams v. Illinois* (2012) ___ U.S. ___ [132 S.Ct. 2221], the statements at issue were those of a prosecution expert who testified that a DNA profile produced by an outside laboratory, Cellmark, matched a profile produced by the state police laboratory using a sample of the petitioner's blood. (*Williams v. Illinois*, *supra*, 132 S.Ct. at p. 2227.) In that case, in addition to holding that out-of-court statements related by experts for the sole purpose of explaining the assumptions on which their opinion rests are not offered for their truth, a plurality of four justices stated that, even if the report in question had been admitted into evidence, it was not testimonial in that it was not sought for the purpose of obtaining evidence to be used against the petitioner, who was not a suspect at the time. (*Id*. at pp. 2228, 2243.) The plurality observed that "[t]he abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions." (*Id*. at p. 2242.)

Similarly, the California Supreme Court, in one of a trilogy of cases decided after *Williams*, stated that, even though the high court had not agreed on a definition of

30

"testimonial," a review of the decisions indicates that a statement is testimonial when two critical components are present. "First, to be testimonial the out-of-court statement must have been made with some degree of formality or solemnity. [Citations.] The degree of formality required, however, remains a subject of dispute in the United States Supreme Court. [Citations.] [¶] Second, all nine high court justices agree that an out-of-court statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution, but they do not agree on what the statement's primary purpose must be." (*People v. Lopez* (2012) 55 Cal.4th 569, 581-582; see also *People v. Dungo* (2012) 55 Cal.4th 608; *People v. Rutterschmidt* (2012) 55 Cal.4th 650.)

Utilizing these guidelines, we conclude the statements at issue here have not been shown to be testimonial. There is no indication that the sources of the detective's information were made in formalized statements, and there is every indication that they were not. Detective Delia's testimony about gang culture in general and Palmas 13 in particular was gleaned from interviews with "hundreds of gang members" as well as instruction and seminars, briefing and training. He also spoke with victims of gang crimes. With regard to Segovia, Detective Delia consulted an FI card written in 2007 by two deputies chronicling an encounter with Segovia and other gangsters. The card stated that Segovia was a suspected member of the Palmas 13 gang, and he was with three other members of that gang. Topete, who testified at trial, approached Detective Delia on the day of the preliminary hearing and asked for protection from Segovia and Aguilera, and at that time he said Segovia was in 13 Kings. The fact that Segovia was driving a car with two other gang members immediately after the carjacking and robbery was another factor causing the detective to believe Segovia was a gang member. Thus, there is no basis upon which to find the required solemnity or formality in the sources of Detective Delia's information regarding gangs, Palmas 13, or Segovia, nor was there any formal interrogation targeting Segovia. Accordingly, there was no confrontation clause violation in the admission of Detective Delia's gang testimony.

In addition, even if error occurred, it was harmless beyond a reasonable doubt. (see *People v. Rutterschmidt*, *supra*, 55 Cal.4th at p. 651.) The jury was instructed that

"Detective Anthony Delia testified that in reaching his conclusions as an expert witness, he considered statements made by other Los Angeles Sheriff Deputies and other certain gang members. You may consider those statements only to evaluate the expert's opinion. Do not consider those statements as proof that the information contained in the statements is true." (CALCRIM No. 360.) Detective Delia was subject to cross-examination, and the information on which he relied was the type of material reasonably relied upon by gang experts. There is no merit to Segovia's argument.

### 3. Evidence Code Section 352

As respondent notes, Segovia's challenge under Evidence Code section 352 was forfeited for failure to object on the same ground below. (*People v. Zapien*, *supra*, 4 Cal.4th at pp. 979-980.) Nevertheless, we address his claim on the merits, given his allegation of ineffective assistance of counsel. We will disturb a trial court's exercise of discretion in admitting evidence pursuant to Evidence Code section 352 only when the trial court's decision exceeds the bounds of reason. (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1519.) "'[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."' [Citation.]" (*People v. Karis*, *supra*, 46 Cal.3d at p. 638.)

We believe Detective Delia's testimony regarding Segovia's gang membership had probative value that outweighed any undue prejudice. It did not require an undue consumption of time, nor did it risk confusing the issues or misleading the jury. In a case such as this, where a gang allegation was made against both participants, the evidence against Topete would have been presented in any event. The probative value was high, and it is well established that the prejudice Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. There was no abuse of discretion.

**VI. Gang Testimony as Violation of Fundamental Fairness and Due Process; Counsel's Failure to Object**

    *A. Segovia's Argument*

    Segovia criticizes the admission of Detective Delia's opinion about the nature of the primary activities of the Palmas 13 gang (robberies, shootings, murder, and narcotics sales). He also views as prejudicial the detective's statements that the "13" in the gang's name stood for the letter "M" and signified the gang's allegiance to the Mexican Mafia, which controls prisons, the narcotics trade, and the south-side gangs in southern California. Citing *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*), Segovia argues that this testimony was erroneously admitted because it was factually unsupported. The testimony was so prejudicial that it had the legal consequence of rendering Segovia's trial fundamentally unfair and violating due process. Segovia adds that trial counsel's failure to move for exclusion of the highly prejudicial gang evidence constituted prejudicially deficient representation.

    *B. Relevant Authority*

    A trial court's admission of evidence, including gang testimony is reviewed for abuse of discretion. (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192-193.) Evidence of gang affiliation and activity is admissible where relevant to issues such as identity, motive, intent, or the truth of a gang enhancement allegation. (*People v. Williams*, *supra*, 16 Cal.4th at p. 193; *Gardeley*, *supra*, 14 Cal.4th at pp. 619-620.) Gang evidence is inadmissible if introduced only to "show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.]" (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449.)

    A criminal defendant has a state and federal constitutional right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*).) Whether or not defendant's trial counsel rendered ineffective assistance must be judged according to well-established criteria. A defendant must first show that counsel's "acts or omissions were outside the wide range of professionally competent assistance." (*Id*. at p. 690.) Secondly, a defendant must show that the alleged deficiencies in counsel's

performance were prejudicial to the defense, i.e., that there is a reasonable probability that but for counsel's unprofessional errors, the outcome of the case would have been different. (*Id*. at pp. 692, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.)

### C. Analysis

Segovia's challenge was forfeited for failure to object on the same ground below. (*People v. Zapien*, *supra*, 4 Cal.4th at pp. 979-980.) Nevertheless, because Segovia adds that the failure of trial counsel to object to Detective Delia's testimony constituted prejudicially deficient representation, we address the claim on its merits.

Detective Delia's testimony regarding certain aspects of the gang involved in the instant crimes was highly relevant and not unduly prejudicial considering the facts of this case. Given that the gangs involved here were Palmas 13 and 13 Kings, it was relevant to ask Detective Delia about the number 13 in these names. Detective Delia explained that the number shows allegiance to the Mexican Mafia. He explained that the Mexican Mafia is the "shot caller" of all south side or Hispanic gangs. If a gang uses the number 13 in its name, it means the gang is paying taxes to the Mexican Mafia. Paying taxes is a kind of "insulator" for gang members who later go to prison. If the taxes are not paid, the inmate will be in bad standing in jail, which could lead to being beaten or killed. The testimony regarding the Mexican Mafia was comprised of less than two pages of the reporter's transcript.

In order to prove the gang allegation of section 186.22, the prosecutor was obliged to present evidence that the crime charged was committed "for the benefit of, at the direction of, or in association with a criminal street gang." (CALCRIM No. 1401.) The jury was instructed that a criminal street gang was, inter alia, an organization "[t]hat has, as one or more of its primary activities, the commission of vandalism, robbery, assault with a deadly weapon, criminal threats, narcotic sales, shootings and murder." The jury was told that the phrase "primary activities" meant that the commission of the crimes "must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the group."

34

Thus, the gang evidence was clearly admissible and necessary to prove the gang allegation. (See *People v. Romero* (2008) 44 Cal.4th 386, 412, fn. 2.) Significantly, the jury was instructed that it must first decide whether defendant committed the crimes charged in counts 1 and 2 before deciding whether the prosecution had proved the gang allegation. (CALCRIM No. 1401.) The trial court instructed the jury that it could consider evidence of gang activity only for the limited purpose of deciding if the defendants acted with the intent, purpose, and knowledge required to prove the gang-related enhancements charged and not for any other purpose. (CALCRIM No. 1403.) We presume, having no indication to the contrary, that the jury followed the proper written instructions it received in the instant case. (*People v. Callahan* (1999) 74 Cal.App.4th 356, 372.)

*Albarran* is distinguishable. Unlike the instant case, the gang evidence in *Albarran* was inflammatory. The prosecutor referred to the defendant's gang as "'dangerous,'" and to the defendant's tattoo as linking him personally to the Mexican Mafia, which he described as a violent prison street gang. (*Albarran*, *supra*, 149 Cal.App.4th at p. 220.) The gang expert noted the gang's graffiti contained specific threats to murder police officers. The expert spoke of a number of the defendant's fellow gang members and their arrests and criminal offenses, which were unrelated to the charged crime. (*Id*. at pp. 220-221.) The gang expert also described how the defendant, upon being arrested, had "'confessed'" to his participation in the shooting that was the source of the charges. (*Id*. at p. 221.) The prosecutor told the jury that defendant's alibi defense was not worthy of belief because he was in a gang. (*Id*. at p. 222.) In addition to finding that the gang evidence was extremely inflammatory and cumulative and had no connection to the charged crime, the reviewing court stated there was nothing inherent in the facts to suggest a specific gang motive. (*Id*. at pp. 227, 228.)

As noted, Detective Delia testified briefly about the Mexican Mafia by way of explaining the "13" in the gang names associated with the defendants. He also mentioned the Mexican Mafia in the context of the consequences of being labeled a "snitch" in jail. Detective Delia said that a snitch may be put on a green-light list to be

beaten or killed, and the list is approved by higher ranking members of gangs and "the Mafia." The latter evidence was highly relevant in the instant case where Topete's testimony was contrary to his prior statements, and where he alleged he had been threatened while in jail. "'The law does not disfavor the admission of expert testimony that makes comprehensible and logical that which is otherwise inexplicable and incredible.'" (*People v. Gonzalez*, *supra*, 38 Cal.4th at p. 947.)

With respect to prejudice, as stated in *Albarran*, we may proceed directly to the issue of whether the admission of the Mexican Mafia evidence and other gang evidence was so serious that it violated Segovia's federal constitutional rights to due process. (*Albarran*, *supra*, 149 Cal.App.4th at p. 229.) If the admission of the evidence violated federal due process, an appellant need not demonstrate the evidence violated the state law standard for prejudicial error. (*Ibid*.) "To prove a deprivation of federal due process rights, [appellant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.]" (*Albarran*, at p. 229; *People v. Partida* (2005) 37 Cal.4th 428, 439.)

In addition to concluding that the evidence was more probative than prejudicial, we believe the complained-of evidence, when considered in context with all of the other evidence, did not result in a trial that was fundamentally unfair. The prosecutor did not mention the Mexican Mafia in his opening statement or closing arguments, unlike the prosecutor in *Albarran*. (*Albarran*, *supra*, 149 Cal.App.4th at p. 220.) The gang evidence related to Palmas 13 and 13 Kings was properly admitted; therefore, no emotional bias can be attributed to the testimony about the Mexican Mafia. And in light of the fact that Detective Delia did not testify that Segovia was actually a Mexican Mafia member, the effect of evidence relating to the Mexican Mafia, was not "so prejudicial as

to render the defendant's trial fundamentally unfair." (*People v. Falsetta* (1999) 21 Cal.4th 903, 913.)

We conclude the admission of the complained-of evidence in this case did not violate Segovia's right to due process, and we also conclude that it is not reasonably probable that a result more favorable to Segovia would have occurred absent the evidence. (*People v. Boyette* (2002) 29 Cal.4th 381, 428 [Standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) applies to analysis of prejudicial state-law error].)

Finally, we do not believe Segovia's trial counsel was ineffective for failing to object to the gang evidence. Given its probative nature on the gang allegation, any objection would have been futile, since the trial court would have overruled the objection. Counsel had no duty to make frivolous or futile objections. (*People v. Weaver* (2001) 26 Cal.4th 876, 931.) Moreover, because we have found the evidence to be not unduly prejudicial, counsel cannot be found ineffective. (*Strickland*, *supra*, 466 U.S. at pp. 692, 694.)

## VII. Denial of New Trial Motion

### A. Segovia's Argument

Segovia contends the trial court erroneously denied his new trial motion, which was based on the newly discovered evidence that Deputy Sorrow had been found liable and ordered to pay a judgment in a civil case for use of excessive force. According to Segovia, the court erred by not ascertaining the facts underlying the excessive force judgment, since the judgment revealed morally turpitudinous conduct on the part of Deputy Sorrow.[9]

---

[9]     On April 2, 2014, this court granted Segovia's request, joined in by Topete, that this court take judicial notice of the published decision of Division Eight of this district entitled *Bender v. County of Los Angeles* (2013) 217 Cal.App.4th 968 (*Bender*) (case No. B236294), as well as a printout obtained from the Los Angeles Superior Court website of the case summary in case No. BC440862, *Noel Bender* vs. *County of Los Angeles et al.*, filed on July 2, 2010.

## B. Relevant Authority

Section 1181, subdivision 8 provides that a trial court may grant a new trial "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." "'"The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears."' [Citations.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 328.) "'[I]n determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background.'" (*People v. Dyer* (1988) 45 Cal.3d 26, 52.)

"In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: '"1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits."' [Citations.]" (*People v. Delgado*, *supra*, 5 Cal.4th at p. 328.)

## C. Proceedings Below

Topete called Deputy Sorrow as a defense witness and questioned him regarding Rivera's statements to the deputy after the carjacking. During cross-examination, the prosecutor attempted to elicit from Deputy Sorrow that the crime scene was hectic and that he may have incorrectly remembered what he heard from Rivera. Segovia's attorney, Mr. Kelly, questioned Deputy Sorrow on redirect examination about his ability to take accurate notes of his interview with Rivera. Mr. Kelly asked the deputy if he still had the field notes, and the deputy replied, "No." When asked if he typically destroyed his notes after an interview, Deputy Sorrow said he did not, but he also said he did not know where the notes from his interviews with Rivera were. Segovia's attorney asked for a sidebar during which he stated he had repeatedly asked the prosecution for the deputy's field notes but had not received them. The prosecutor replied that he had not

38

been aware of their existence.  The prosecutor was ordered to tell the deputy to retain the notes if he could find them.

Verdicts were reached in May 2012, and after several continuances, the new trial motion came up for hearing on January 30, 2013.  The trial court stated it had read the moving papers of both defendants.  The court questioned Segovia's attorney regarding the statement in his papers that Deputy Sorrow's notes contained exculpatory evidence.  Mr. Kelly replied that this contention was based on all of the circumstances, since the defense had not seen the notes.  The deputy testified that he always kept his notes, but ultimately he could provide only the notes from his shorter, first interview with Rivera.  The second interview was more in depth, but  "magically, those notes have vanished."  Mr. Kelly stated that there had been a finding of excessive force with regard to Deputy Sorrow, and the jury had not been aware of this moral turpitude issue.  According to Mr. Kelly, the "13th-hour" discovery about Deputy Sorrow "cast a real dark shadow on this issue."

The court questioned whether a civil judgment for excessive force was a "moral turpitude type of crime."  Mr. Kelly said it was, but he had no authority to support that position.  Mr. Kelly did not know the facts of the other case or the degree of force used.  Mr. Kelly asserted that the deputy had "given these conflicting stories and catch-up stories on these notes of an in-depth interview where my client was not identified, but the other two were."  Topete's attorney said she joined the motion for new trial because any evidence negative in nature affected Topete, even though not directly.

The prosecutor argued that the determinative factor at issue was whether the evidence would render a different result probable upon retrial.  The prosecutor asserted he had complied with *Brady* in that there had been no information on Deputy Sorrow's name and badge number prior to trial.  At some point after that, the judgment appeared in the *Brady* database.  There were, however, no findings of any moral turpitude against the deputy.  The *Brady* unit of the district attorney's office stated the information was not necessarily discoverable and left it up to the prosecutor to decide whether to disclose the information, and he had done so.  There was nothing to indicate the deputy lied or did

39

anything that equated to moral turpitude. Moreover, Rivera testified two times, and Deputy Sorrow corroborated Rivera's testimony by testifying that Rivera was never able to identify Segovia.

Mr. Kelly and Ms. Fujita suggested that more investigation into what conduct was the subject of the civil suit might be appropriate. The court stated that Mr. Kelly had had his opportunity, since the motion had been put over since October of the prior year.

The court ruled the motion was denied based on the moving papers, the arguments, the evidence, and the law. It found the prosecutor did not use any reprehensible methods to influence the jury, and his conduct was not prejudicial. The court found without merit the defense contention that the evidence of the deputy being found civilly liable on an excessive force case and being ordered to pay damages would have probably led to a different result. Although the defense speculated the notes contained exculpatory information, there was no such evidence. Under *People v. Hall* (2010) 187 Cal.App.4th 282, a new trial on the grounds of newly discovered evidence is not granted where the only value of the evidence was impeachment. Had the defense known about the deputy's civil judgment earlier, the court would have found the evidence irrelevant and denied its admission on Evidence Code section 352 grounds. The probative value of the evidence was slight and would have substantially been outweighed by the danger of confusion of issues and undue consumption of time.

### D. Analysis

Segovia argues that Rivera's statements to Deputy Sorrow regarding the third perpetrator were crucial to his defense. Mr. Kelly contended that Rivera told the deputy not just that he could not identify the third perpetrator, but that Segovia *was not* the third perpetrator. Mr. Kelly maintained that Deputy Sorrow's use of excessive force was an act involving moral turpitude and was admissible at a new trial to impeach him. Segovia complains that the trial court was obligated to ascertain the facts underlying the excessive force judgment in order to determine its materiality under *Brady*, and it never sought to do so.

40

"Critically, '[a] new trial on the ground of newly discovered evidence is not granted where the only value of the newly discovered testimony is as impeaching evidence' or to contradict a witness of the opposing party. [Citations.]" (*People v. Hall*, *supra*, 187 Cal.App.4th at p. 299.) In *Hall*, the court found that the trial court properly denied Hall's motion for new trial because the purpose of the new evidence was to contradict the prosecution's expert witness. (*Ibid*.) As in *Hall*, Segovia admits that the purpose of the evidence of Deputy Sorrow's moral turpitude was admissible for impeaching him at Segovia's trial.

Regardless of the facts surrounding the deputy's prior uses of excessive force, of which we have been apprised by means of the opinion in *Bender*, *supra*, 217 Cal.App.4th at pages 972-976, 982, the evidence was not relevant to any issue in Segovia's case, except for general impeachment of the deputy's veracity. In the context of the deputy's testimony, this impeachment was of little value, since the deputy testified only about what Rivera told him, and none of that information was inculpatory of Segovia. "'[A] motion for a new trial should be granted when the newly discovered evidence contradicts the strongest evidence introduced against the defendant.'" (*People v. Delgado*, *supra*, 5 Cal.4th at p. 329.) Here, Deputy Sorrow's testimony was clearly not the strongest evidence against Segovia. Indeed, the evidence was more favorable than unfavorable to both defendants. The deputy was called as a defense witness by Ms. Fujita, Topete's attorney. Deputy Sorrow testified that Rivera never said Topete told Aguilera to take Rivera's keys and wallet. Rivera said the other two perpetrators demanded money and Rivera's wallet. Rivera did not say Topete took anything from him. Rivera did not say the third person—the one who came to the driver's door—was the one who reached into his pockets or that he had a knife. Deputy Sorrow testified that Rivera did not identify Segovia at the field showup.

We agree with the trial court that it is unlikely that a jury that heard what Segovia labels "new evidence" would have reached a different verdict with respect to Segovia. Deputy Sorrow was called as a defense witness because his testimony revealed inconsistencies between Rivera's statement and his testimony. It would have been of

41

little value to impeach him, unless raising the specter of police brutality was perceived by the defense as of some value to its case. Whether or not Deputy Sorrow exhibited "moral depravity," as Segovia asserts, would not have put the entire case against Segovia in such a different light so as to undermine confidence in the verdict. (*Strickler v. Green* (1999) 527 U.S. 263, 290.) Deputy Sorrow did not investigate the instant case. He merely interviewed the victim twice and filed a police report summarizing these interviews and Rivera's field showup identifications. Contrary to Segovia's assertions the credibility of the defendants versus that of Deputy Sorrow was not key to the jury's finding of guilt. Accordingly, we do not believe the trial court abused its discretion in denying Segovia's motion for a new trial.

## VIII. Denial of Due Process by Prosecutor's Alleged Suppression of Evidence

### A. Segovia's Argument

Segovia contends that the prosecutor's failure to disclose evidence of excessive force complaints and judgments against Deputy Sorrow denied him due process under *Brady*. He contends the prosecution withheld material evidence from him and from the jury about Deputy Sorrow's pervasive misconduct in other cases. The suppression of the evidence was prejudicial to his case and requires reversal of the judgment.

### B. Relevant Authority

"In *Brady*, the United States Supreme Court held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' [Citation.] The high court has since held that the duty to disclose such evidence exists even though there has been no request by the accused [citation], that the duty encompasses impeachment evidence as well as exculpatory evidence [citation], and that the duty extends even to evidence known only to police investigators and not to the prosecutor [citation]. Such evidence is material "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" [Citation.]" (*People v. Salazar* (2005) 35

42

Cal.4th 1031, 1042.)  A *Brady* claim is subject to independent review.  (*Salazar*, at p. 1042.)

Kyles v. Whitley (1995) 514 U.S. 419 stated that the test of materiality is not whether "the defendant would more likely than not have received a different verdict with the [exculpatory] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  (*Id*. at p. 434.)  The court also said that the defendant must show "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  (*Id*. at p. 435, fn. omitted.)

### C.  Analysis

Segovia argues that, in the instant case, all three *Brady* requirements were satisfied.  The evidence was favorable and material because the misconduct evidence would have impeached the deputy's credibility regarding the actual words used by Rivera in failing to identify Segovia as the third perpetrator.  Secondly, the prosecution had constructive, if not actual, knowledge that there had been complaints against Deputy Sorrow and that he had been found liable.  Thirdly, given there was no evidence other than Topete's purported statements to Deputies Roach and Delia implicating Segovia— which Topete denied making at trial—and only circumstantial evidence of Segovia's guilt, there is a reasonable probability that the result of trial would have been different had the misconduct evidence been disclosed to the defense.

At the outset, it appears the prosecutor complied with his obligations under *Brady*. The prosecutor informed the defense about the judgment against Deputy Sorrow as soon as he learned of it.  The prosecutor "ran the deputy's name and badge number, and no hits came up" prior to trial.  When the results did appear, the *Brady* unit at the district attorney's office stated that the judgment was not necessarily discoverable because there was no moral turpitude associated with it, and it was left to the individual deputy district attorney to decide whether to disclose the matter.

Nevertheless, even if constructive knowledge of the judgment at an earlier date is attributed to the prosecution, Segovia's claim fails because there is no reasonable

probability that the verdicts would have been different had the evidence of Deputy Sorrow's excessive-force judgments been disclosed to the defense and to the jury. As we observed in the previous section, Deputy Sorrow was called by the defense as a witness, and he testified that Rivera was not able to identify Segovia. He revealed inconsistencies in Rivera's testimony. There was no showing the deputy's notes would have revealed that Rivera stated affirmatively that Segovia was not the third attacker. Therefore, despite the absence of evidence of the judgment against Deputy Sorrow and his prior excessive force incidents, Segovia fails to show that, given the nature of Deputy Sorrow's role in the instant case and the nature of what he could testify to, the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (*Kyles v. Whitley*, *supra*, 514 U.S. at p. 435, fn. omitted.)

## IX. Admission of Topete's Statements to Deputies Hernandez and Roach

### A. Topete's Arguments

Topete contends that admission of his statements to Deputies Hernandez and Roach was a violation of his Fifth and Fourteenth Amendment rights, and he contends his answers to the deputies' questions about his gang affiliation were not routine booking questions and were designed to elicit an incriminating response. Therefore, a *Miranda* advisement was required. Topete asserts that the error was not harmless beyond a reasonable doubt.

### B. Proceedings Below

Deputy Hernandez testified that he booked Topete. He did not recall if he asked Topete if he had a moniker. When shown the booking slip, Deputy Hernandez acknowledged that Topete told him he was known as "Bad Boy" and was a member of the Palmas gang. After a recess, Topete's attorney, Ms. Fujita, called for an Evidence Code section 402 hearing on whether Topete's remarks about his gang were elicited in violation of *Miranda*. The prosecutor argued that routine booking questions do not constitute interrogation. Ms. Fujita stated that Topete was in custody when questioned by Deputy Hernandez. Topete should have been *Mirandized* even if the questions were for administrative purposes. She also argued that the deputy had brought in damaging

44

information through the back door and it should be excluded under Evidence Code section 352.

Deputy Hernandez then testified in order to lay a foundation. He stated that Topete made the statements in the patrol car while Deputy Roach was filling out the booking slip. Deputy Hernandez was driving and did not hear all of the questions and answers.

During further argument, the prosecutor asserted that asking about gang affiliation was routine because of the need to separate inmates from rival gangs. The prosecutor provided the court with the booking slip, and the court stated that the questions appeared to be routine booking questions. The court also found that the probative value was not substantially outweighed by the danger of prejudice, undue consumption of time, or confusion of issues.

Deputy Roach testified before the jury that he began asking routine booking questions in the patrol car and also helped in booking Topete at the station. He asked Topete if he was in a gang, and Topete replied he was from Palmas 13 and he gave his moniker as Bad Boy. Topete said he had been on his way to a gang meeting on "P Block."

The prosecution also called Deputy Roach on rebuttal. He testified that it was standard procedure for one officer to drive and the other officer to fill out the booking form in the patrol car in order to expedite the booking process. Segovia's attorney cross-examined the deputy about his first conversation with Topete—the one where he implicated Segovia and Aguilera in the robbery and carjacking. The police report on the first conversation stated, "'I contacted Topete and advised him of his *Miranda* rights.'"

### C. Relevant Authority

"The prophylactic *Miranda* protections are triggered only if a defendant is subjected to a custodial interrogation. [Citation.] Interrogation refers not only to express questioning, but also to its functional equivalent; i.e., "'any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"

45

[Citation.] However, not all police questioning of a person in custody constitutes interrogation. [Citation.] The exclusion for communications 'normally attendant to arrest and custody' recognizes that the police may properly perform their normal administrative duties that are *distinct from their investigatory function* without giving rise to *Miranda* protections. [Citations.] [¶] For example, under the "'routine booking question" exception' to the *Miranda* rule, the police need not provide *Miranda* warnings prior to asking routine booking questions to secure biographical information. [Citations.] Also, the *Miranda* requirements are generally not implicated when the police ask questions related to safety concerns that arise during the arrest or booking process. [Citations.] Similarly, casual conversations or 'small talk' unrelated to the offense do not typically constitute a *Miranda* interrogation. [Citations.] [¶] The fact that information gathered from routine questions or casual conversations turns out to be incriminating does not alone render the statements inadmissible. [Citation.] This principle excluding routine or casual communications from *Miranda's* coverage can apply even when a defendant has already received *Miranda* warnings and invoked his or her rights. [Citations.]" (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 86-87, fn. omitted.)

In assessing whether *Miranda* warnings should have been given before routine questioning or casual conversations, among the factors to be considered are the nature and context of the questioning, the knowledge and intent of the officer asking the questions, the relationship between the questions and the crime, and the administrative need for the questions. (*People v. Gomez* (2011) 192 Cal.App.4th 609, 630-631 (*Gomez*).)

In reviewing the trial court's denial of a motion to exclude evidence based on *Miranda* violations, we defer to the trial court's factual and credibility findings if supported by substantial evidence. We independently determine whether the statements were illegally obtained. (*Gomez*, *supra*, 192 Cal.App.4th at p. 627.)

### D. Analysis

Topete argues that all of the *Gomez* factors weigh against applying the booking exception to the questioning in this case. We conclude that because the questions asked

46

of Topete during booking may not reasonably be construed as calling for an incriminating response, no *Miranda* warning was required. The fact that information gathered from routine questions or casual conversations turns out to be incriminating does not alone render the statements inadmissible. (See *Gomez*, *supra*, 192 Cal.App.4th at p. 629.)

The record indicates that the standard booking slip used by Deputy Roach provided a place for noting information about a detainee's gang affiliation. As stated in *Gomez*, gang affiliation is an important factor for the secure housing of inmates. (*Gomez*, *supra*, 192 Cal.App.4th at pp. 634-635.) Because Deputy Roach was merely following a standard booking procedure, it cannot be said he asked the question as a pretext to soliciting incriminating statements. At the moment Topete was being booked, it was not clear that the crime was a gang-related crime.

We note, however, that Topete does not dispute that he was advised of his *Miranda* rights by Deputy Roach prior to their first conversation in the patrol car. Topete argues that no evidence was given about the contents of that *Miranda* warning, but Topete's counsel did not ask about the contents, nor did Segovia. Deputy Roach's testimony was not contradicted, and was sufficient to establish that Topete was given the *Miranda* advisory. (Evid. Code, § 411.)

Finally, any error in admitting Topete's gang admission to Deputy Roach was harmless beyond a reasonable doubt. (*People v. Johnson* (1993) 6 Cal.4th 1, 33.) There was ample evidence of Topete's gang membership. He had admitted his membership and his moniker to Deputy Crosby in 2011 while in the Las Palmas gang area. He also admitted his membership to Detective Delia twice in 2011. Topete had tattoos on his body that were gang related. Topete had been stopped with other Palmas 13 gang members in the gang's territory.

Topete argues that the error was not harmless because, other than Rivera's contradictory testimony, the only evidence that he participated in the crimes came from the deputies who attributed statements to him that were not recorded. We disagree with Topete that Rivera's testimony was so contradictory as to be insufficient to convict him. Rivera was thoroughly cross-examined by Topete's attorney. She pointed out the

47

inconsistencies between Rivera's preliminary hearing testimony, the police reports detailing Rivera's prior statements, and his trial testimony on direct examination— precisely the discrepancies Topete mentions in his opening brief. Counsel read back various portions of the preliminary hearing transcript. In closing argument, counsel urged the jury to consider the inconsistencies in Rivera's testimony and his failure to recall certain facts and statements he made. Counsel asked the jury to consider the jury instruction that tells the jury to ask whether a witness made a statement in the past that is consistent or inconsistent with his or her testimony. (CALCRIM No. 226.) Thus, the jury was very aware of any contradictions in Rivera's statements and of the statements he made that he no longer recalled. It was within the province of the jury as the trier of fact to assess the credibility of the witness and weigh the available inferences. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1183.) Any contradictions revealed by Rivera's testimony merely raised a credibility issue for the jury to resolve. (*People v. Glaude* (1983) 141 Cal.App.3d 633, 641.)

## X. Questioning Regarding Topete's Prior Arrests

### A. *Topete's Argument*

Topete contends that the prosecutor's questions regarding his prior arrests for DUI and robbery violated his federal constitutional rights to due process, a fair trial, and to present a defense. He asserts that: evidence of mere arrests is inadmissible; he did not open the door to the evidence; the prosecutor's questions alone supplied an inference Topete had been arrested for robbery; the evidence was not admissible under Evidence Code section 1101, subdivision (b); and the evidence was inadmissible under Evidence Code section 352 in violation of due process and a fair trial and defendant's right to present a defense. Topete states that, if this court believes any of these grounds had been forfeited, his counsel was ineffective for failing to object on that ground. Topete adds that he was prejudiced by the error, since, but for admission of this evidence, it is reasonably probable the jury would have rendered a more favorable verdict. He also argues that the admission of the prior arrests was not harmless beyond a reasonable doubt.

48

### B. *Proceedings Below*

During trial, Topete's attorney complained that she was not given discovery of an arrest report on Topete. The prosecutor informed the court that it did not intend to use the evidence of Topete's prior arrest. Topete's attorney withdrew her Evidence Code section 402 challenge to the evidence but stated she was unsure whether to close out her investigation of the robbery. The prosecutor said she could close it out because he did not believe he would use the evidence.

Topete took the stand, and during cross-examination, the following exchange occurred:

"Q: After you run home, you're worried about what is going to happen; right?

"A: Yes.

"Q: And you see Mr. Segovia, who just, coincidentally, happens to be there. You get in his car; right?

"A: Yes.

"Q: You didn't think to yourself, 'Maybe it would be better for me to go inside my house where no one can find me and see me rather than get in a car where people will see me?'

"A: It was the first time in a situation like this.

"Q: So you've never been in a situation before where you've had troubles like these?

"A: I've never been in trouble.

"Q: Okay."

The prosecutor asked to approach the bench and told the court that because Topete had said he had never been in trouble, he should be allowed to question Topete about his prior arrest. Ms. Fujita argued that the reason the door had been opened was due to the way the prosecutor had posed his questions. The court ruled that, based on the witness's testimony and his defense, he had opened the door, and the prosecutor's proposed impeachment was proper. The jury was entitled to hear a follow-up question by the prosecutor.

49

Upon the prosecutor's resuming questioning, he asked Topete, "So you indicated that you have never been in trouble like this before; correct?" Topete said, "Yes." The prosecutor asked him if he had not been arrested for a DUI, and Topete acknowledged that he had. Topete then denied that he had been arrested for another robbery. The prosecutor showed Topete an arrest report for purposes of refreshing his recollection. When the prosecutor asked again if police had spoken to him about a robbery, Topete said he was asked for information and told he had nothing to do with it. The prosecutor returned to questioning about the day of the Rivera robbery and carjacking.

### C. Relevant Authority

The trial court has broad discretion to admit or exclude impeachment evidence. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.) Its discretion will not be disturbed, unless there is a "showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. [Citation.]" A miscarriage of justice occurs only when it appears reasonably probable that a result more favorable to defendant would have been reached in the absence of the error. (*Watson*, *supra*, 46 Cal.2d at p. 836.) Arrests are generally inadmissible. (*People v. Medina* (1995) 11 Cal.4th 694, 769.)

### D. Analysis

We conclude the evidence of Topete's prior arrests was admissible to impeach his credibility. It was not admitted to attack his credibility generally, however. Rather, the evidence was relevant and admissible under Evidence Code section 780, subdivision (i).

Pursuant to Evidence Code section 780, subdivision (i), a trial court may admit otherwise inadmissible evidence for impeachment purposes to prove or disprove the existence or nonexistence of a fact about which a witness has testified or opened the door. (*Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938, 946 ["[A] witness who makes a sweeping statement on direct or cross-examination may open the door to use of otherwise inadmissible evidence of prior misconduct for the purpose of contradicting such testimony"]; *Leader v. State of California* (1986) 182 Cal.App.3d 1079, 1089-1092; see also *People v. Cooks* (1983) 141 Cal.App.3d 224, 324; *People v.*

*Reyes* (1976) 62 Cal.App.3d 53, 61-62.)  The rule admitting evidence after a witness has opened the door prevents the witness from misleading the jury or misrepresenting facts. (*People v. Robinson* (1997) 53 Cal.App.4th 270, 282-283.)

In this case, on cross-examination, Topete made the sweeping statement that he had never been in trouble.  This testimony led to the inference that Topete was an innocent person who was in the wrong place at the wrong time.  By impliedly asserting that he acted out of fear and confusion because he had never been involved in anything remotely against the law before, Topete opened the door to cross-examination about his past conduct.  As held in *People v. Cooks*, *supra*, 141 Cal.App.3d at page 324, it was not improper for the prosecutor to briefly cross-examine Topete about his prior arrests.  In this way, Topete was prevented from misleading the jury or misrepresenting the facts. The evidence had a "tendency in reason to prove or disprove the truthfulness of his testimony at the hearing," by establishing the "nonexistence of [a] fact testified to by him."  (Evid. Code, § 780, subd. (i); *People v. Rodriguez*, *supra*, 20 Cal.4th at p. 9 ["always relevant for impeachment purposes are the witness's capacity to observe and the existence or nonexistence of any fact testified to by the witness"].)  He was allowed to deny the robbery arrest without any further questioning by the prosecution.  The trial court did not abuse its discretion.

Topete also argues that the evidence was inadmissible under Evidence Code section 352, and it violated his Fourteenth Amendment rights to due process and a fair trial.  He asserts that his trial counsel was ineffective for not preserving those grounds for review.

We believe the trial court did not err under Evidence Code section 352 by allowing the prosecutor to briefly question Topete about his prior arrests.  The evidence of the DUI arrest was not inflammatory, and Topete categorically denied any prior arrest for robbery, stating that the police had only asked for his assistance in gathering evidence.  The evidence was, however, potentially probative regarding Topete's portrayal of himself as a young man who had never been in trouble and had been taken advantage of by the perpetrators—members of the gang he wanted to leave so much that he had

gone to get jumped out a second time. The brief questioning did not require an undue consumption of time, and a DUI arrest was highly unlikely to evoke an emotional bias against Topete on the part of the jury. "[A]dmissible evidence often carries with it a certain amount of prejudice, [and] Evidence Code section 352 is designed for situations in which evidence of little evidentiary impact evokes an emotional bias." (*People v. Olguin*, *supra*, 31 Cal.App.4th at p. 1369.) Topete denied any involvement in any robbery, and it was left at that.

In addition, because the impeachment evidence at issue did not prejudice Topete, his counsel was not ineffective for failing to object on due process grounds or Evidence Code section 352 grounds. (*Strickland*, *supra*, 466 U.S. at pp. 692, 694.) And, although counsel stated she had "closed out" her investigation on the prior arrests in reliance on the prosecutor's statement that he would not introduce evidence of those arrests, there is no support for Topete's claim he was deprived of his right to present a defense to the evidence. Even after being shown a police report, Topete adamantly denied any involvement in any robbery, including the instant robbery, and insisted the police had asked him for help in gathering evidence. The prosecution presented no evidence to rebut these assertions, and the jury was left with the impression that Topete had been helpful to police investigators.

"The general rule remains that '"the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense. Courts retain . . . a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.'" [Citations.]" (*People v. Lawley* (2002) 27 Cal.4th 102, 155.) We believe that the totality of the evidence, rather than the brief mention of Topete's prior arrest, which he denied, was the deciding factor in the jury's estimation of Topete's credibility. No miscarriage of justice occurred as a result of the prosecutor's question, and it does not appear that a result more favorable to Topete would have been reached in the absence of this evidence. (Cal. Const., art. VI, § 13; *Watson*, *supra*, 46 Cal.2d at p. 836.) Moreover, the jury was instructed with CALCRIM No. 222 that questions were not evidence and the

jury must not assume something is true just because one of the attorneys asked a question suggesting it was true. Finally, Rivera's testimony and the circumstantial evidence of the location of the items in Topete's carport as well as his presence in the car with Segovia and Aguilar minutes after the crimes were strong evidence of Topete's guilt. Any error in admitting the evidence was harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18 [harmless beyond a reasonable doubt]; *Watson*, *supra*, 46 Cal.2d at p. 836 [reasonable probability the error did not affect the outcome].)

## XI. Prosecutorial Misconduct

### A. *Topete's Argument*

Topete contends the prosecutor committed prejudicial misconduct under state and federal law by questioning Topete about his prior arrests. Topete asserts that the prosecutor's questions were designed to elicit inadmissible and prejudicial answers. Moreover, the prosecutor knew he could not prove Topete was involved in the robbery if he denied it. In addition, the issue of Topete's arrests was irrelevant. If the jurors had not heard that Topete had been arrested on a separate robbery, they would have been more willing to accept his version of events. The misconduct was prejudicial under any standard of prejudice. If this court finds the issue was forfeited, trial counsel was ineffective.

### B. *Relevant Authority*

We set out the authority on prosecutorial misconduct in a previous section of this opinion.

### C. *Analysis*

The record shows the trial court ruled that Topete had opened the door for evidence regarding his past encounters with law enforcement by testifying that he had never been in trouble before. The trial court, after hearing argument from both sides, allowed the prosecutor to question Topete about his two arrests. Therefore, the prosecutor did not commit misconduct by asking a question calling for inadmissible evidence. The evidence was admissible for impeachment of Topete under Evidence Code section 780, as we have stated previously. The prosecutor did not display a pattern

of conduct that infected the trial with unfairness, nor did he employ deceptive or reprehensible methods to attempt to persuade the jury.

Contrary to Topete's assertion, the prosecutor was not unable to prove Topete's arrest, since the record shows the prosecutor had an arrest report, which he showed to Topete. That the prosecutor did not belabor the point when Topete said detectives had pulled him out of his cell in order to obtain information did not mean the prosecutor knew he could not prove Topete was actually arrested. Rather, it indicates the prosecutor believed he had no reason to instigate a mini-trial on this issue, since the evidence was only offered for its impeachment value.

In any event, even if the questioning about prior arrests could be deemed misconduct, defendant was not prejudiced thereby. Even if a defendant shows that prosecutorial misconduct occurred, reversal is not required unless the defendant can demonstrate that a result more favorable to him would have occurred absent the misconduct or with a curative admonition. (*People v. Arias* (1996) 13 Cal.4th 92, 161.) As we have stated in the previous section, there was strong evidence of Topete's guilt, and the jury was instructed that an attorney's question does not constitute evidence, nor should its contents be considered as true. It is not reasonably probable that the trial would have resulted in an outcome more favorable to Topete had the alleged misconduct not occurred.

## XII. Topete's Ineffective Assistance of Counsel Claim

### A. Topete's Argument

Topete argues that trial counsel was ineffective for failing to request a limiting instruction, such as CALCRIM No. 316, Alternative B,[10] on the evidence of his prior

---

[10] CALCRIM No. 316, Alternative B reads as follows: "If you find that a witness has committed a crime or other misconduct, you may consider that fact [only] in evaluating the credibility of the witness's testimony. The fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable."

arrests.  He asserts counsel could have had no tactical reason for not requesting such an instruction, and the failure to do so prejudiced him, requiring reversal.

### B. Analysis

We have set out the pertinent authority on ineffective assistance of counsel in a previous section.  Here, trial counsel's failure to draw attention to the brief mention of Topete's prior arrests for DUI and robbery was not "outside the wide range of professionally competent assistance." (*Strickland*, *supra*, 466 U.S. at p. 690.)  It may well have been part of counsel's strategy to ameliorate any prejudice caused by the prosecutor's mention of these arrests.  Counsel may have determined that an instruction on this very issue would unduly emphasize the fact of these arrests, and Topete's denial of the robbery arrest was more beneficial to the defense.  Because defense counsel's purpose in failing  to request a limiting instruction is unclear, we cannot conclude that she had no reason for the omission.

In any event, Topete also fails to meet the second prong of the *Strickland* test for ineffective assistance of counsel.  As we have indicated several times, the brief mention of Topete's prior arrests along with his emphatic denial of a prior arrest for robbery eliminated any undue prejudice from this information.  As noted, CALCRIM No. 222 instructed the jury that it must not assume that something is true merely because an attorney's question suggested it was true.  In addition, CALCRIM No. 220 told the jury that it "must not be biased against the defendants just because they have been arrested, charged with a crime, or brought to trial."  These instructions adequately informed the jury of the concept that Topete alleges was lacking, i.e., the fact that the jury must not judge Topete's guilt on the carjacking and robbery based on any alleged past crimes, and they cured any prejudice caused by a failure to request a further limiting instruction.

## XIII.  Cumulative Error

### A. Defendants' Arguments

Topete asserts that the instant case was close on the issue of guilt and was based primarily on unreliable hearsay regarding the gang allegation.  He claims there is a reasonable probability that without the multiple errors, the jury would have reached a

more favorable result. According to Segovia, the accumulated errors, considered together, took away from him all possibility and opportunity for the jury to make a fair and just appraisal of his defense.

In examining cumulative error, the critical question is "whether defendant received due process and a fair trial." (*People v. Kronemyer* (1987) 189 Cal.App.3d 314, 349; accord, *People v. Cain* (1995) 10 Cal.4th 1, 82 [a defendant is entitled to a fair trial, not a perfect one].) A predicate to a claim of cumulative error is a finding of error, and we have found no prejudicial error. Our review of the record assures us that defendants received due process and a fair trial. (See *People v. Ashmus* (1991) 54 Cal.3d 932, 1006.) Therefore, there was no cumulative error requiring reversal.

## DISPOSITION

The judgments are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


BOREN, P.J.

We concur:


CHAVEZ, J.


FERNS, J.*

_____

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.